UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

XL SPECIALTY INSURANCE COMPANY,

               Plaintiff,

      -against-

JOHN R. LAKIAN, DIANE W. LAMM, and
KOBRE & KIM LLP,

               Defendants,

      -and-

EISEMAN LEVINE LEHRHAUPT &
KAKOYIANNIS, P.C., BRIEF CARMEN &
KLEIMAN, LLP, MERRILL COMMUNICATIONS,
LLC, KNOX, LLC d/b/a KNOX, LLC OF NEW YORK,
DJW ADVISORS, LLC, and PANGEA CAPITAL
MANAGEMENT, LLC,

               Intervening Defendants.

KOBRE & KIM LLP,

               Counterclaim Plaintiff,

      -against-

XL SPECIALTY INSURANCE COMPANY,

               Counterclaim Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/2017

14 Civ. 5225 (KMW)

**MEMORANDUM
OPINION & ORDER**

KIMBA M. WOOD, District Judge:

    This is an interpleader action brought by Plaintiff XL Specialty Insurance Company

("XL") to resolve competing claims to the remaining $1,372,596.10 (the "Interpleaded Funds")

of a $3 million financial services liability policy (the "Policy") purchased by non-party Capital L

Group, LLC ("Capital L"), which provided insurance for Capital L's CEO, Defendant John R.

Lakian, and its COO, Defendant Diane W. Lamm, with certain exceptions.  XL interpleaded as

defendants Lakian, Lamm, and Kobre & Kim LLP ("Kobre & Kim").  On January 15, 2015, the

Honorable Analisa Torres granted motions to intervene by Eiseman Levine Lehrhaupt & Kakoyiannis, P.C. ("Eiseman"), Brief Carmen & Kleiman ("Brief Carmen"), and Merrill Communications LLC ("Merrill"), and denied motions to intervene from Knox, LLC d/b/a Knox, LLC of New York ("Knox") and DJW Advisors, LLC ("DJW"). ECF No. 68. On March 19, 2015, XL, Lakian, Lamm, Kobre & Kim, Eiseman, Brief Carmen, and Merrill filed a settlement agreement (the "Settlement Agreement"), ECF No. 87, which Judge Torres ordered on April 24, 2015, ECF No. 100. Following a decision by the Second Circuit Court of Appeals, Judge Torres vacated the order denying Knox and DJW's motion to intervene and the final judgment implementing the Settlement Agreement, and instead granted Knox and DJW's motion to intervene and a motion to intervene by Pangea Capital Management, LLC ("Pangea"). ECF No. 122. The case was transferred to the undersigned on November 11, 2016.

Before the Court are motions for summary judgment[1] filed by (1) Kobre & Kim, Eiseman, Brief Carmen, and Merrill (the "K&K" motion), (2) Knox and DJW (the "Knox" motion), and (3) Pangea. ECF Nos. 138, 143, 145.[2] Knox and Pangea each claim that they are entitled to the Interpleaded Funds; K&K moves to dismiss Knox's, DJW's, and Pangea's claims to the Interpleaded Funds, and moves for a judgment in accordance with the terms of the Settlement Agreement. For the reasons set forth below the Knox and Pangea motions are DENIED, and the K&K motion is GRANTED.

---

[1] Although Kobre & Kim asserted counterclaims against XL in its answer, ECF No. 80, the adjudication of those counterclaims were stayed pending resolution of the present summary judgment motions, ECF No. 128.

[2] XL, Lakian, and Lamm join K&K's motion for re-approval of Settlement Agreement. ECF Nos. 152, 153, 164.

# I. BACKGROUND[3]

1. <u>The Policy</u>

This interpleader action arises from an insurance policy, Financial Services Liability Policy Number ELU1236303-11, issued by XL to Capital L for the period of November 11, 2011, to November 11, 2012. K&K 56.1 Stmt. ¶ 1, ECF No. 137; Hansen Decl. Ex. 1 ("Policy"), Fin. Servs. Liab. Policy Decls. Items 1-3, ECF No. 140-1. The Policy provided for a maximum aggregate limit of liability of $3 million, of which $1,372,596.10 remains. K&K 56.1 Stmt. ¶ 11. That remainder, the Interpleaded Funds, was deposited with the Court on July 28, 2014, pursuant to Local Civil Rule 67.1 and as required by 28 U.S.C. § 1335. K&K 56.1 Stmt. ¶ 12; Dkt. Entry, July 31, 2014, Receipt No. 465401101200.

The Policy provides that "[t]he Insurer shall pay on behalf of the Insured Persons Loss resulting from Claims first made against the Insured Persons during the Policy Period . . . for Wrongful Acts." K&K 56.1 Stmt. ¶ 3; Policy, Inv. Advisers Mgmt. Liab. Coverage Part § 1(A). The Policy also provides that "[t]he Insurer shall pay on behalf of the Adviser Loss which the Adviser is required or is permitted to pay . . . resulting from Claims first made against the Adviser . . . for Wrongful Acts." Policy, Inv. Advisers Mgmt. Liab. Coverage Part § 1(B).

The Policy defines "Insured Persons" as including "any past, present or future director, officer, or member of the Board of Managers of" Capital L. K&K 56.1 Stmt. ¶ 6; Policy, Inv. Advisers Mgmt. Liab. Coverage Part § II(D)(1). The Policy defines a "Loss" as including "damages, judgments, settlements or other amounts (including punitive, exemplary or multiplied damages where insurable by law) in excess of the Retention that the Insured is obligated to pay,

---

[3] The facts below are undisputed unless otherwise noted. *See* Pangea Resp. to K&K and Knox 56.1 Stmts., ECF No. 156; Knox Resp. to K&K 56.1 Stmt., ECF No. 160; Know Resp. to Pangea 56.1 Stmt., ECF No. 161; K&K Resp. to Knox and Pangea 56.1 Stmts., ECF No. 163.

and Defense Expenses, whether incurred by the Insurer or the Insured." K&K 56.1 Stmt. ¶ 5; Policy, Endorsement No. 6.  The Policy defines a "Claim" as including, among other things, "any civil proceeding in a court of law or equity, or arbitration." K&K 56.1 Stmt. ¶ 10; Policy, Gen. Terms & Conditions, § 1(B)(2).  The Policy defines a "Wrongful Act" as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty," and must arise, for an Insured Person, "solely by reason of his or her status as [an Insured Person]." K&K 56.1 Stmt. ¶ 7; Policy, Inv. Advisers Mgmt. Liab. Coverage Part § II(F)(1), (2).

The Policy states that "[i]t shall be the duty of the Insured to defend any Claim under this Policy." K&K 56.1 Stmt. ¶ 8; Policy, Gen. Terms & Conditions § II(B)(1).  Further, "No Insured may incur any Defense Expenses or admit any liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent, such consent not to be unreasonably withheld." K&K 56.1 Stmt. ¶ 9; Policy, Gen. Terms & Conditions § II(B)(2).  "As a condition precedent to any right to payment under this Policy, the Insured shall give written notice to the Insurer of any Claim as soon as practicable after it is first made." *Id.* § II(C)(1).

The Policy excludes Loss in connection with any Claim that was "brought about or contributed to in fact by any: (1) intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or (2) profit or remuneration gained by any Insured to which Insured is not legally entitled." *Id.* § III(A).  Once the limit of liability is reached, "all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy." *Id.* § II(J).

2.  <u>The Knox Action</u>

In May 2012, Knox and DJW filed a complaint against Capital L, Lakian, Lamm, and JRL Investment Group, Inc. (not a party here) (the "Knox Action").  K&K 56.1 Stmt. ¶ 13; *see Knox LLC, et al. v. Capital L Group, LLC, et al.*, No. 651880/2012 (N.Y. Sup. Ct.).  The complaint included allegations that Lakian and Lamm fraudulently induced Knox and DJW to invest over $2 million in Capital L and that they breached their fiduciary duties by misusing the investments for personal benefit.  Knox 56.1 Stmt. ¶ 4, ECF No. 144.  Lakian and Lamm initially retained Kobre & Kim to defend them.   Compl. ¶ 39, ECF No. 2.  When Kobre & Kim withdrew, Lakian hired Eiseman, and Lamm hired Brief Carmen.  *Id.* ¶ 41.  The Knox Action constitutes a "Claim" under the Policy, K&K 56.1 Stmt. ¶ 19, and on June 20, 2012, XL acknowledged coverage under the Policy for Lakian and Lamm.  Knox 56.1 Stmt. ¶ 5; Compl. ¶ 38.

Despite being served with a copy of the complaint and, later, an amended complaint, Capital L failed to appear in the Knox Action.  K&K 56.1 Stmt. ¶¶ 14-16.  On January 3, 2013, XL's counsel sent a letter (the "January 2013 Letter") to Capital L's insurance broker that acknowledged that Knox and DJW had filed a motion for default judgment against Capital L, noted that Capital L had a duty to defend under the Policy, and requested information as to whom to contact at Capital L.  Knox 56.1 Stmt. ¶ 8; Halpern Aff. Ex. F at 4, ECF No. 148-7.  Knox and DJW's motion for a default judgment against Capital L was granted in July 2013.  K&K 56.1 Stmt. ¶ 17; *Knox*, No. 651880/2012, Doc. No. 63 (N.Y. Sup. Ct. July 23, 2013).  Default judgments against Capital L in favor of Knox and DJW totaling over $2.5 million were filed in the New York County Clerk's Office in March 2014.  K&K 56.1 Stmt. ¶ 18; Knox 56.1 Stmt. ¶ 11.

Lakian and Lamm were charged, in February 2015, in a five-count criminal indictment that alleged conspiracy to commit securities fraud, wire fraud, and bank fraud, and two counts of securities fraud.  Knox 56.1 Stmt. ¶¶ 18-19.  Lakian and Lamm pled guilty to the two securities fraud counts in February 2016.  Knox 56.1 Stmt. ¶ 20; Halpern Aff. Exs. M, N.

The parties disagree about whether (1) XL acknowledged coverage under the Policy for Capital L, (2) Capital L sought or obtained XL's consent before defaulting, and (3) XL was ever served with a copy of the default judgment against Capital L.  K&K 56.1 Stmt. ¶¶ 20-22; Knox Resp. to K&K 56.1 Stmt. ¶¶ 20-22 (denying all three paragraphs); Pangea Resp. to K&K 56.1 Stmt. ¶¶ 20-22 (admitting all three paragraphs).

3.  <u>The Branigan Action</u>

In addition to his role as a member of Capital L's Board of Managers, Lakian served as a managing member of Pangea from approximately 2009 to 2011.  K&K 56.1 Stmt. ¶ 23.  In June 2012, Pangea and one of Pangea's managing members, Mark Branigan, filed a complaint against Lakian and Lamm, among others, in New York State Supreme Court (the "Branigan Action").  K&K 56.1 Stmt. ¶ 24; *see* Spatola Decl. Ex. 3 ("Branigan Compl."), ECF No. 142-3.  The allegations in the Branigan Action "concern[ed] the fiduciary obligations owed by the managers of Pangea to each other, and to Pangea, itself, and Lakian's abuse of that position of trust to perpetrate a fraud upon Branigan, Pangea, and its investors," with the assistance of Lamm.  K&K 56.1 Stmt. ¶ 25 (internal quotation marks omitted); Branigan Compl. ¶ 10.  The Branigan Action plaintiffs alleged that Lakian and Lamm fraudulently induced them into making investments in Capital L and then misused those investments.  Compl. ¶ 26.  XL has confirmed its obligation to cover Lamm in connection with the Branigan Action, but has denied coverage to Lakian.  *See* Compl. ¶ 31-32; K&K 56.1 Stmt. ¶ 27.  The parties agreed to resolve the Branigan Action by

arbitration.  K&K 56.1 Stmt. ¶ 28.  The arbitration statement of claim was filed in November 2012, and included the same causes of action as the state court complaint and additional causes of action arising out of the same underlying conduct.  K&K 56.1 Stmt. ¶¶ 29, 30.  On February 2, 2016, Pangea obtained an award (the "Arbitration Award") against Lakian on its claims for fraud, breach of fiduciary duty, and a violation of RICO.  K&K 56.1 Stmt. ¶ 32.  On November 22, 2016, subsequent to the filing of the present motions, the Arbitration Award was reduced to a judgment, and the Honorable Lewis A. Kaplan entered a judgment (the "Arbitration Judgment") of over $14 million against Lakian.  K&K 56.1 Stmt. ¶ 34; Letter from Pangea, ECF No. 170; *Pangea Capital Management, LLC v. Lakian*, No. 16 Civ. 840, ECF No. 87.  The action against Lamm was stayed due to Lamm's filing of Chapter 7 bankruptcy in September 2014.  Pangea 56.1 Stmt. ¶ 17, ECF No. 146.

The parties disagree on whether the Branigan Action, the arbitration, the Arbitration Award, and the Arbitration Judgment arose solely out of Lakian's status as a member of Capital L's Board of Managers, or whether they arose, at least in part, out of his status as a managing member of Pangea.  K&K 56.1 Stmt. ¶¶ 26, 31, 33; Knox Resp. to K&K 56.1 Stmt. ¶¶ 26, 31, 33 (admitting all three paragraphs); Pangea Resp. to K&K 56.1 Stmt. ¶¶ 26, 31, 33 (denying all three paragraphs).  If the award did not arise solely out of Lakian's status as a member of Capital L's Board of Managers, it may not be covered by the Policy.  *See* Policy, Inv. Advisers Mgmt. Liab. Coverage Part § 2(F)(1) (limiting coverage of a "Wrongful Act" for "Insured Persons" to acts "solely by reason of his or her status as [an Insured Person]").

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a). A dispute of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.; see also Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In determining whether there are genuine disputes of material fact, the Court "must 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Roe,* 542 F.3d at 35 (quoting *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir. 2001)). "In an interpleader action, each claimant has the burden of establishing her right to the property by a preponderance of the evidence, and although certain claims may be disposed of by summary judgment, that does not automatically entitle the remaining defendants to the funds." *McEnery v. Gallagher,* No. 93 Civ. 5795, 1996 WL 457297, at *3 (S.D.N.Y. Aug. 14, 1996) (citing *Midland Ins. Co. v. Friedgood,* 577 F. Supp. 1407, 1410 (S.D.N.Y. 1984)).

### III. DISCUSSION

1. <u>Knox and DJW</u>

Knox and DJW assert a claim to the Interpleaded Funds based on their default judgments against Capital L in the Knox Action. Knox Mem. 9-19, ECF No. 149. The default judgment against Capital L, Knox argues, is a Loss under the Policy, defined, in part, as "damages, judgments, settlements or other amounts . . . that the Insured is obligated to pay," Policy, Endorsement No. 6—under the Policy that XL is obligated to pay. Knox further contends that XL waived any possible coverage defenses—such as breaches of the Policy by Capital L—in

either XL's January 2013 Letter to Capital L's insurance broker or by filing this interpleader action without seeking declaratory judgment as to Knox's claim.  However, the Court is unpersuaded that the Policy can be ignored as Knox suggests; this action is still governed by the terms of the Policy, and because Capital L breached the Policy by defaulting in the Knox Action, Knox and DJW cannot recover under the Policy on the basis of its default judgment.

    a.  <u>Capital L Breached the Policy</u>

Capital L is entitled to coverage from XL under the Policy only to the extent that it complied with the Policy's terms and conditions.  *See, e.g.*, Policy, Gen. Terms & Conditions § II(L)(1)(a) ("No action may be taken against the Insurer unless, as a condition precedent thereto . . . there has been full compliance with all terms and conditions of this Policy.").  By failing to appear in the Knox Action, Capital L breached the Policy in at least two material respects: first, by failing to fulfill its "duty of the Insured to defend any Claim under this Policy," Policy, Gen. Terms & Conditions § II(B)(1); and second, by admitting liability without XL's consent, Policy, Gen. Terms & Conditions § II(B)(2) ("No Insured may incur any Defense Expenses or admit any liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent . . . .").

Knox does not—and cannot—deny that Capital L failed to defend itself in the Knox Action.  *See, e.g.*, Knox Reply 20, ECF No. 168.  Default is undeniably a failure to defend.  *See, e.g.*, Fed. R. Civ. P. 55(a) (defining "default" as a failure to "plead or otherwise defend"); C.P.L.R. § 3215 ("When a defendant has failed to appear, plead or proceed to trial . . . , the plaintiff may seek a default judgment against him.").  Instead, Knox argues that XL had a duty to take action to avoid default judgment against Capital L.  Knox Opp. 12-13, ECF No. 162.  Knox first cites *American Transit Insurance Co. v. Hashim*, 68 A.D.3d 618 (N.Y. App. Div. 2009), for

the proposition that the insurer has a duty to indemnify the insured where the insurer "could have appeared, opposed the motion, and filed for leave to file a late answer, but pursued none of those options." Knox Opp. 12 (quoting *Hashim*, 68 A.D.3d at 619). However, the insurer's coverage defense in *Hashim* was late notice, not the insured's duty to defend, and the court found that "[h]aving received timely notice of claim, plaintiff insurer was not entitled to disclaim coverage based on untimely notice of the claimant's commencement of litigation unless it was prejudiced by the late notice." *Hashim*, 68 A.D.3d at 619. Knox also cites *American Transit Insurance Co. v. B.O. Astra Management Corp.*, 12 Misc. 3d 740 (N.Y. Sup. Ct. 2006), which required an insurer to indemnify an insured following a default judgment where the "insurer could have prevented default 'but chose instead to allow the default judgment to be entered unopposed.'" Knox Opp. 12 (quoting *Astra*, 12 Misc. 3d at 746). Here, too, the insurer sought to assert a "timely notice" coverage defense, which the court rejected. *Astra*, 12 Misc. 3d at 746. Neither authority imposes an affirmative duty on an insurer to prevent a default where the insurance policy does not impose such a duty. XL had no obligation under the Policy to act to prevent entry of default. The Policy did, however, impose an explicit duty to defend on Capital L.

Knox further contends that the "lack of vitiating coverage language associated with . . . the Policy's 'duty to defend' provision (in contrast to the Policy's notice provision)" suggests that coverage cannot be denied on the basis of the duty to defend. This argument is unavailing, as it would vitiate the provision itself. Further, the Policy states that "No action may be taken against the Insurer unless, as a condition precedent thereto . . . there has been full compliance with all terms and conditions of this Policy." Policy, Gen. Terms & Conditions § II(L)(1)(a); *cf. State Farm Indem. Co. v. Moore*, 58 A.D.3d 429, 430 (N.Y. App. Div. 2009) ("When an insured deliberately fails to cooperate with its insurer in the investigation of a covered incident as

10

required by the policy, the insurer may disclaim coverage."); *Van Gordon v. Otsego Mut. Fire Ins. Co.*, 232 A.D.2d 405, 406 (N.Y. App. Div. 1996) ("The noncooperation of an insured party in the defense of an action is a ground upon which an insurer may deny coverage and may be asserted by the insurer as a defense in an action on a judgment by an injured party." (citations omitted)).  Capital L's failure to defend itself in the Knox Action precludes Capital L from recovering under the Policy for that action; Knox and DJW, as subrogees, therefore have no claim under the Policy.

Second, Capital L breached the Policy by failing to acquire XL's consent before defaulting in the Knox Action, which is tantamount to admitting liability.  "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability . . . ." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *see also S.E.C. v. Razmilovic*, 738 F.3d 14, 19 (2d Cir. 2013) ("The complaint's well-pleaded allegations as to [the defendant's] liability, which, in light of his default, are deemed admitted . . . .").  An insurer's right to consent to a settlement is considered, under New York law, a condition precedent to coverage.  *PB Americas Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 249-50 (S.D.N.Y. 2010) (citing *Vigilant Ins. Co. v. Bear Stearns Companies, Inc.*, 10 N.Y.3d 170, 177-79 (2008)).  Although Knox suggests that "these types of 'consent' clauses are routinely addressed only in the context of the insured's failure to obtain an insurer's consent to *settle*," Knox Reply 18, Knox provides no support to indicate that such a clause would not apply with equal force to a defaulting insured.  The Policy forbids an insured from admitting liability, making a settlement offer, or settling without the XL's consent.  Policy, Gen. Terms & Conditions § II(B)(2).

Accordingly, Capital L breached the Policy by failing to defend itself in the Knox Action. Knox and DJW, as Capital L's creditors, are thus not entitled to recover under the Policy.

b.  Waiver

Despite Capital L's breaches of the Policy, Knox contends that it is entitled to recover because XL waived possible coverage defenses in its January 2013 Letter or by not pleading the defenses in this interpleader action.  Neither argument protects Knox's claim.

First, Knox argues that XL's letter in January 2013, which contained a reservation of rights referencing certain provisions of the XL Policy, implicitly waives XL's right to assert certain coverage defenses.  Knox Reply 13-14 (citing *Olin Corp. v. Ins. Co. of N. Am.*, No. 84 Civ. 1968, 2006 WL 509779, at *3 (S.D.N.Y. Mar. 2, 2006) ("[W]here, as here, an insurer actually asserts certain policy defenses, whether by disclaimer or reservation of rights, the insurer is deemed to have waived any other unasserted grounds for refusing coverage.")).  However, the facts of *Olin Corp.* are readily distinguishable.  First, the insurer in *Olin Corp.* stated that it "reserve[d] their right re coverage and punitive damages," *id.* at *2, whereas XL's letter states that it "reserves *all rights* under the Policy and at law," Halpern Aff. Ex. F at 4 (emphasis added).  Surely XL needed not articulate every possible coverage defense in its January letter.  Further, *Olin Corp.* was an extension of *State of New York v. AMRO Realty Corp.*, 936 F.2d 1420 (2d Cir. 1991), which stated than an "insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *Id.* at 1432 (citing *Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1090 (2d Cir. 1986)).  XL's January 2013 Letter was not, however, a denial of a claim request or an assertion of any coverage defenses.  On the contrary, XL's letter to Capital L's insurance broker was a preemptive step by XL prior to Capital L's breach of the Policy.  *Cf. Allstate Ins. Co. v. Am. Home Prod. Corp.*, No. 01 Civ. 10715, 2010 WL 1257337, at *7-8

(S.D.N.Y. Mar. 31, 2010) (finding that a denial of coverage on certain asserted grounds waives unasserted grounds).  The Court cannot conclude that XL waived any coverage defenses based on the January 2013 Letter.

Knox further argues that XL waived all coverage defenses by depositing the Interpleaded Funds with the court without retaining a stake or interest in the funds.  Knox Mem. 10-13.  In support of its position, Knox cites a footnote from a decision in the Southern District of Ohio, *Great American Ins. Co. v. Spraycraft, Inc.*, 844 F. Supp. 1188 (S.D. Ohio 1994).  There, the court applied New York's "first in time, first in right" rule to determine the priority of five claimants in an insurance interpleader case.  *Id.* at 1190-91.  All five claimants had judgments against an insured.  *Id.*  The insurer, the interpleader plaintiff, deposited the full limit of the insurance policy with the court, and was then dismissed from the case.  *Id.* at 1190.  One claimant argued that its claim should be prioritized because it obtained a judgment against the insurer directly, whereas the other claimants had judgments only against insureds.  *Id.* at 1192.  The court rejected that distinction, stating that "the direct nature of [the insurer's] liability thereon is of no significance for purposes of this interpleader action."  *Id.* at 1193.  The critical language relied upon by Knox is in a footnote, which states:

> Although [the insurer's] direct liability for a particular judgment might be of great significance in an action in which [the insurer] was attempting to deny coverage under an insurance contract, that simply is not the case here. *[The insurer] apparently abandoned all contract defenses and conceded liability for the full limits of its property damage coverage by initiating this interpleader action and depositing its stake with the Court.*

*Id.* at 1193 n.3 (emphasis added).  The Court reads this footnote to suggest that the insurer, having deposited the full limit of the insurance policy with the court and having been dismissed from the action, could no longer argue that it was not obligated to pay the full $300,000.  Knox,

13

in contrast, argues that this footnote stands for the proposition that a party without a valid claim under an insurance policy could nonetheless make an interpleader claim to the insurance proceeds. On its face, this argument would lead to the absurd result that the Court would be asked to adjudicate competing claims to insurance proceeds without the guidance of the terms of the insurance policy. Interpleader is available to a stakeholder facing "adverse claimants . . . [who] are claiming or may claim to be entitled to such money or property," 28 U.S.C. § 1335(a)(1); it would be contrary to the purpose of an interpleader action to allow a party who did not previously have a claim to the interpleaded funds to acquire a claim on the basis of the interpleader action.

Applying *Great American*, Knox argues that "the interpleader sought must be of a specific nature" such that an insurer must "seek in its interpleader complaint a declaration of noncoverage . . . that would mandate that claims to interpleaded proceeds comply with the terms and conditions of the policy." Knox Reply 7-8. XL, indeed, did exactly that: in its interpleader complaint, XL pleaded various terms and conditions of the Policy, including the duty to defend, Compl. ¶ 24; *see* Compl. ¶¶ 15-25, and stated its denial under the Policy for Lakian's claims related to the Branigan Action, Compl. ¶ 32. XL attached the Policy to the interpleader complaint. Compl. Ex. A. In addition, XL stated in the complaint that it "named as defendants herein all persons or entities who have to date sought payment under the Policy." Compl. ¶ 50. In contrast, Capital L never made a claim under the Policy related to the Knox Action, nor is there evidence that Knox or DJW sought coverage from XL related to their default judgment against Capital L prior to this interpleader action. Even under Knox's formulation of the rule, the Court cannot reasonably expect an interpleader plaintiff to plead with specificity the noncoverage of potential claimants who had not yet come forward to make a claim.

Although there appears to be no binding caselaw on these issues, the bulk of authorities weigh against Knox's argument. *See, e.g.*, 4 New Appleman Law of Liability Insurance § 40.04, Lexis (database updated 2016) ("The bringing of an interpleader action does not create any new rights in the claimants for the fund.  The court must still determine the right, if any, of each claimant to a part of the fund. Claimants must, therefore, prove their cases before they become entitled to a share of the insurance proceeds."); *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) ("A contractual right may be waived if it is knowingly, voluntarily and intentionally abandoned.  But waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection.  Mere silence, oversight or thoughtlessness in failing to object is insufficient to support an inference of waiver." (citations and internal quotation marks omitted)); *Charter Oak Ins. Co. v. Maglio Fresh Food*, 979 F. Supp. 2d 581, 597 (E.D. Pa. 2013) (finding, under Pennsylvania law, that "the payment of the policy limit via the equitable interpleader action cannot be deemed an intentional waiver of Charter Oak's defenses to coverage").  The undersigned agrees with the Honorable Analisa Torres' prior opinion, now vacated as premature, that, "Knox and DJW have identified no basis in law for holding that an insurer, simply by initiating an interpleader action, affords to all putative intervenors an incontrovertible interest in the proceeds irrespective of the terms of the policy at issue."  ECF No. 68, *vacated by* ECF No. 122.

Indeed, the Second Circuit opinion, which reversed Judge Torres' order denying Knox and DJW's motion to intervene, undercuts Knox's argument.  The Second Circuit held that the determination to deny Knox's claim to the Interpleaded Funds was "premature," *XL Specialty Ins. Co. v. Lakian*, 632 F. App'x 667, 669 (2d Cir. 2015), and that the merits question of

15

coverage defenses were "better addressed after Knox and DJW have been permitted to participate in the suit," *id.* at 670.  The Second Circuit could have reversed on the ground that XL's coverage defenses were waived, but did not, and instead remanded the case for further litigation on the question of coverage defenses.  *Id.*; *see* Brief for Intervenors-Appellants at *3, *22-25, *XL Specialty Ins. Co. v. Lakian*, No. 15-495, 2015 WL 3529894 (2d Cir. June 2, 2015) (presenting the waiver of coverage defenses argument under *Great American*).

Finally, K&K contend that Knox's argument is undermined by the rule that an insurer may still require, at the least, "substantial compliance" with the terms of the policy in an interpleader action.  K&K Opp. 9, ECF No. 158; K&K Reply 2, ECF No. 169; *see Wilton Reassurance Life Co. of N.Y. v. Garbrecht*, No. 13 Civ. 5536, 2014 WL 6850968, at *9-10 (S.D.N.Y. Dec. 3, 2014) ("[A]n insurer waives strict compliance with the policy provisions by bringing an action in inter-pleader.  But interpleader does not waive the requirement that a change of beneficiary be in at least substantial compliance with the terms of the policy." (citations omitted) (quoting *William Penn Life Ins. Co. of N.Y. v. Viscuso*, 569 F. Supp. 2d 355, 365 (S.D.N.Y. 2008)) (citing *McCarthy v. Aetna Life Ins. Co.*, 92 N.Y.2d 436, 442 (1998); *Lopez v. Mass. Mut. Life Ins. Co.*, 566 N.Y.S.2d 359, 360 (App. Div. 1991))).  Knox responds that this doctrine is "narrowly circumscribed and is specifically limited to changes of beneficiary in the life insurance context."  Knox Reply 10-11.  Although the caselaw does not indicate that this doctrine is applicable only to changes of a life insurance beneficiary, the Court cannot find any caselaw applying this rule outside of that context, and thus declines to rest its decision on that basis.  However, the purpose of such a rule is to *relax* the usual "strict compliance" requirement—to "serve[] the paramount goals of ensuring that life insurance proceeds are disbursed consistently with an insured's stated intent and of preventing the courts and parties

from engaging in rank speculation regarding the wishes of the deceased," *McCarthy*, 92 N.Y.2d at 440—which suggests that strict compliance, rather than broad waiver, is the background rule.

*      *      *

In sum, the Court concludes that XL did not waive the coverage defenses articulated in the Policy in commencing this interpleader action. Capital L breached the Policy in at least two material respects by defaulting in the Knox Action, and is therefore not entitled to recover under the Policy. Knox and DJW do not, therefore, have a claim to the Interpleaded Funds.[4]

2. Pangea

Pangea asserts a claim to the Interpleaded Funds on the basis that Pangea is a judgment creditor of Lakian, based on the Arbitration Judgment in the Branigan Action, and can therefore attach Lakian's coverage under the Policy for the Knox Action.[5] Pangea Mem. 11-27, ECF No. 151. In the alternative, Pangea urges the Court to "exercise its equitable power to apportion to Pangea its *pro-rata* share of the Interpleaded Funds." Pangea Mem. 27; *see id.* at 27-38. Both arguments are unsuccessful.

a. Attachment as Judgment Creditor

Pangea argues that it may, pursuant to C.P.L.R. sections 5201 and 6202, use its Arbitration Judgment to attach Lakian's interest in the interpleaded funds. *See* Pangea Mem. 9-

---

[4] Knox does not argue that it could use its default judgment against Capital L to attach Capital L's interest in the Policy as a judgment creditor. For the reasons discussed in section III.2.a, *infra*, this argument would be unsuccessful.

[5] Pangea does not appear to assert that the Branigan Action is covered under the Policy and, therefore, Pangea, standing in Lakian's shoes, has a direct claim to the Interpleaded Funds. *See* K&K Mem. 17-18, ECF No. 139 (anticipating and refuting this argument); Pangea Opp. 31-32 (failing to defend the argument). XL denied coverage for the Branigan Action because the Policy limits coverage of a "Wrongful Act" for "Insured Persons" to acts "*solely* by reason of his or her status as [an Insured Person]," and the Branigan Action pertained to actions by Lakian in his position as a managing member of Pangea. Policy, Inv. Advisers Mgmt. Liab. Coverage Part § 2(F)(1) (emphasis added); Hansen Decl. ¶ 7; *see* K&K 56.1 Stmt. ¶ 23. The Court agrees with this conclusion and, since Pangea does not argue otherwise, the Court finds that Pangea's Arbitration Judgment in the Branigan Action does not constitute a "Claim" under the Policy.

27.  In opposition, Knox and K&K argue that (1) Pangea's claim to the Interpleaded Funds is

barred as untimely by *Avant Petroleum, Inc. v. Banque Paribas,* 853 F.2d 140, 143 (2d Cir.

1988), *see* K&K Opp. 10-16; Knox Opp. 20-23; and (2) Pangea, as a judgment creditor, may not

attach to Lakian's interest in the Interpleaded Funds, *see* K&K Opp. 16-20.  The Court agrees

with Knox and K&K.

First, *Avant Petroleum* stands for the proposition that a court must evaluate the competing

claims to an interpleader fund as of the time the action commenced.  *See* 853 F.2d at 143.  K&K

and Knox argue that Pangea had no right to any funds under the Policy when this action was

filed and the funds deposited with the court in July 2014—Pangea's Arbitration Award was

issued in February 2016, and the Arbitration Judgment was entered in November 2016—and

therefore, pursuant to *Avant Petroleum*, Pangea's claims to the Interpleader Funds must be

dismissed.  K&K Opp. 11-12; Knox Opp. 20-23.  Pangea contends that it "has had a claim

against an insured under the Policy since at least June 2012 when it commenced its antecedent

state court litigation against, *inter alia*, Lakian," Pangea Opp. 26, ECF No. 157, and the

"claim . . . ripened into an Award" in 2016.  Pangea Opp. 29.  Pangea also highlights the

undisputed fact that the Branigan Action constituted a Claim for Lamm under the Policy.  Pangea

Opp. 27-28.

*Avant Petroleum* contains an important discussion of the priority of interpleader

claimants who make claims when then interpleader fund is deposited with the court as contrasted

with claims arising later:

> The court will normally adjudicate the rights of the claimants as of
> the time the interpleader fund is deposited with the court.  *Cf.*
> *Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658, 661 (2d
> Cir. 1940) (liens valid at the time of commencement of bankruptcy
> proceedings do not lose their validity during the course of the
> proceedings).  A claim not existing at the time the fund was created

18

thus could not take precedence over preexisting claims, except to the extent that the debtor would retain an interest in the fund over and above the total meritorious claims of the interpleader defendants. *Cf. Clarkson Co. v. Shaheen*, 716 F.2d 126, 129 (2d Cir. 1983) (once property came into the custody of the court for the plaintiff's benefit, "no subsequent activity could give third parties a superior claim").

. . . . The fact that "[t]here may be other claims out there which were not asserted by possible claimants not made parties . . . should not prevent the court from dealing with the parties and claims before it." *Lear Petroleum Corp. v. Wilson*, 730 F.2d 1363, 1364 (10th Cir. 1984). The issues are defined by the pleadings of the parties before the court and, in the absence of special circumstances, the court normally determines the rights of the parties on the basis of the facts as they existed at the time the action was commenced.

*Id.* at 143. A rule to the contrary would allow one claimant to obtain an advantage over others during the pendency of an interpleader action, which "would create the bizarre result that the very act of setting up the 'trust' in order to protect and preserve property for the benefit of its rightful owner would be the indirect cause of that rightful owner losing its rights to the property. Such an outcome is not only inequitable, but it is also inconsistent with the notion that the funds are held by the Court pending determination of the rightful owner at the time of the interpleader." *Id.* at 145 (quoting *Avant Petroleum, Inc. v. Banque Paribas*, 652 F. Supp. 542, 547 (S.D.N.Y. 1987)).

Courts within and without the Second Circuit have applied *Avant Petroleum*'s limitation on timely interpleader claims. *See, e.g., Deutsche Bank Trust Co. Americas v. Elliot Int'l, L.P.*, No. 09 Civ. 5242, 2011 WL 2421297, at *3 (S.D.N.Y. June 6, 2011) ("However, this Court must determine the rights of the parties *at the time the action was commenced.*"), *on reconsideration in part*, No. 09 Civ. 5242, 2011 WL 10901798 (S.D.N.Y. Sept. 2, 2011); *see also White v. F.D.I.C.*, 19 F.3d 249, 252 (5th Cir. 1994) ("Today, we join with our brethren of the Second Circuit to hold that activity subsequent to the initiation of an interpleader action is normally

immaterial in determining which claimant has a superior right to the interpleader fund.");

*Texaco, Inc. v. Ponsoldt*, 118 F.3d 1367, 1370 (9th Cir. 1997) ("We agree with the sound

reasoning of both the Fifth and Second Circuits and hold that a district court must normally

determine the priority of claims in an interpleader action as they existed at the time the action

was initiated.  This rule is consistent with logic and with our own indication that funds held in

the court's registry, as interpleader funds are held, are not usually subject to attachment or

garnishment. . . .  As the entire point of an interpleader action is to resolve then competing rights

and claims, it makes perfect sense that the action itself cannot be used as a vehicle for further

jockeying for claim position.  It should just be a straightforward determination of the priority of

the claims as they existed at the time the interpleader became viable."); *cf. Reliance Nat. Ins. Co.*

*v. Great Lakes Aviation, Ltd.*, 430 F.3d 412, 415 (7th Cir. 2005).

   Pangea's argument, therefore, is unsuccessful.  Because the Policy does not cover

Lakian's liability in the Branigan Action, Pangea had no claim to the Interpleaded Funds until

2016, when it obtained the Arbitration Award and the Arbitration Judgment.[6]  *See Avant*

*Petroleum*, 853 F.2d at 143; *cf. B & A Demolition & Removal, Inc. v. Markel Ins. Co.*, 818 F.

Supp. 2d 592, 596 (E.D.N.Y. 2011) ("Without an unsatisfied judgment against Defendants,

Plaintiff has no legally protectable interest in litigating the terms of the [Defendants' agreements

with their insurance carrier]." (quoting *National Fire Ins. Co. of Hartford v. Starbro Const.*

*Corp.*, No. 08 Civ. 3200, 2009 WL 2602281, *5 (E.D.N.Y. 2009)).  Pangea had no right or claim

to the Interpleaded Funds at the time the suit was filed; rather, it had a contingent claim based on

---

[6] The parties dispute whether Pangea's Arbitration Award, before it was confirmed by the District Court, was enforceable. *See, e.g.*, K&K Opp. 12-14; Pangea Opp. 30-31. However, this dispute is immaterial: whether Pangea's claim against Lakian was finalized in February 2016 or November 2016 does not affect the analysis herein.

a pending unrelated lawsuit against an insured.  This is insufficient, and to find otherwise would ignore the clear instruction of *Avant Petroleum*.

Pangea further argues that the coverage afforded to Lakian under the Policy for the Knox Action constitutes a "debt" under C.P.L.R. § 5201(a) or a "property" under C.P.L.R. § 5201(b) that is subject to attachment by Pangea as a judgment creditor under C.P.L.R. § 6202.   Pangea Mem. 11-21.  However, as Lakian is not entitled to recover any portion of the Interpleaded Funds under the Policy, Pangea's attempt to attach Lakian's interest fails.  *Wenig v. Glens Falls Indem. Co.*, 294 N.Y. 195, 198-99 (1945) ("The rule is well settled that a judgment creditor, seeking to enforce a policy insuring the judgment debtor against liability, stands in the shoes of the assured and can recover against the insurer only if the assured could recover under the terms of the policy.").  Under the Policy, which is held by Capital L, Lakian and Lamm are third-party beneficiaries.  Policy, Fin. Servs. Liab. Policy Decls. Item 1 (listing "Capital L Group, LLC" as the "Named Insured"); Policy, Inv. Advisers Mgmt. Liab. Coverage Part § 1(A) (stating XL's obligation to "pay on behalf of the Insured Persons" for covered losses); *see Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94 Civ. 2727, 1997 WL 906427, at *6 (S.D.N.Y. Sept. 12, 1997) .  The benefit due to Lakian under the Policy is not "debt" owed to Lakian that may ever be "due or . . . become due," C.P.L.R. § 5201(a), nor is it a "property" that can "be assigned or transferred," C.P.L.R. § 5201(b).  *See* Siegel, N.Y. Prac. § 488 (5th ed.) ("If the judgment debtor has no right to the money or property, then neither has the judgment creditor, even though the money may be due in conjunction with a transaction in which the judgment debtor was much involved, and perhaps even the key figure." (citing *Security Nat. Bank v. Associated Hosp. Serv.*, 313 N.Y.S.2d 561 (Sup. Ct. 1970)).[7]

---

[7] Pangea's reliance on *Seider v. Roth*, 17 N.Y.2d 111 (1966), *Simpson v. Loehmann*, 21 N.Y.2d 305 (1967), and *Considine v. Pichler*, 72 A.D.2d 103 (1979), is misplaced.  These cases involved an insurer's obligation to defend

Accordingly, Pangea is not a proper claimant to the Interpleaded Funds by virtue of its Arbitration Judgment.

b. Equitable Powers

Finally, Pangea urges the Court to "exercise its equitable powers to apportion to Pangea its *pro rata* share of the Interpleaded Funds." Pangea Mem. 28; *see* Pangea Mem. 28-31. Citing *United States v. Benitez*, 779 F.2d 135 (2d Cir. 1985), Pangea suggests that the Court should give it priority over the other claimants, who are non-judgment creditors, because Pangea is an adjudged victim of Lakian's fraudulent scheme. In *Benitez*, the Second Circuit affirmed the district court's decision to establish a constructive trust for the benefit of all of the debtor's 53 victims, giving those victims priority over a general claimant. *Id.* at 137. However, XL is the interpleader plaintiff, not Lakian, and Pangea has no valid claim to the Interpleaded Funds, as discussed above. Pangea's appeal to the Court's equitable powers does not justify deviating from the clear legal principles in this case. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (quoting *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988))). The Court therefore declines to exercise its equitable power in favor of Pangea.

3. Kobre & Kim, Eiseman, Brief Carmen, and Merrill

Knox and Pangea oppose K&K's request to reinstate the Settlement Agreement by attacking the K&K parties' claims to the Interpleaded Funds.

First, Knox argues that the K&K parties' are not entitled to summary judgment on their claims to the Interpleaded Funds because "a claimant must succeed in establishing his right to

---

and indemnify an insured judgment debtor, not a third-party beneficiary. *Seider*, 17 N.Y.2d at 112; *Simpson*, 21 N.Y. 2d at 308; *Considine*, 72 A.D.2d at 104.

22

the property by a preponderance of the evidence." Knox Opp. 23-24 (quoting *Metro. Life Ins. Co. v. Jacques*, 396 F. App'x 709, 710 (2d Cir. 2010)). The Court agrees: the K&K motion did not attempt to establish their rights to the Interpleaded Funds, and summary judgment in their favor is inappropriate. The K&K parties are, however, entitled to settle the case as they see fit: the interpleader statute does not require the Court to scrutinize and approve a settlement in an interpleader action.

Pangea argues that Lamm's bankruptcy precludes Lamm's creditors—K&K, Eiseman, and Merrill—from recovering under the Policy. Pangea Mem. 31-35. However, Lamm's coverage under, and interest in, the Policy ceased upon the commencement of this interpleader action: XL deposited the remainder of the Policy's proceeds with the court, fulfilling the exhaustion provision of the Policy and extinguishing any interest Lamm may have held under the Policy. *See* Policy, Gen. Terms & Conditions § II(J); *cf. Avant Petroleum*, 853 F.3d at 143. As the Policy was a liability policy, rather than an indemnity policy,[8] XL's obligation to Lamm's claimants is not extinguished upon Lamm's bankruptcy. *175 E. 74th Corp. v. Hartford Acc. & Indem. Co.*, 51 N.Y.2d 585, 591 (1980) ("[T]he insolvency of an insured gave no benefit to insurers where the insurance was against liability, for the event insured against was the liability itself and payment of a judgment was irrelevant to the insurer's obligation." (citing 11 Couch on Insurance § 44.4 (2d ed.)); *see also In re Prudential Lines Inc.*, 158 F.3d 65 (2d Cir. 1998) (stating that with a "policy of indemnity rather than a liability policy," an insurer is released of its obligations to an insolvent insured (citing *Jackson v. Citizens Cas. Co.*, 277 N.Y. 385, 389

---

[8] Under an indemnity policy, the insurer is responsibly only for payments actually made by the insured. When an insured is insolvent, no further payments are made, and the insurer is relieved of any obligation. Under a liability policy, an insurer is responsible for any liability incurred by the insured while the policy was effective. *Miller v. Am. S.S. Owners Mut. Prot. & Indem. Co.*, 509 F. Supp. 1047, 1048 (S.D.N.Y. 1981). Accordingly, an insured's liability policy is generally not an asset of the insured's bankruptcy estate. *Landry v. Exxon Pipeline Co.*, 260 B.R. 769, 786–87 (Bankr. M.D. La. 2001). *But see In re Tri-Valley Corp.*, No. 12-12291, 2014 WL 6680354, at *3 (Bankr. D. Del. Nov. 25, 2014).

(1938))).  The Court finds that Lamm's bankruptcy does not preclude K&K's, Eiseman's, and Merrill's claims to the Interpleaded Funds.

That all said, as the remaining parties wish to settle, the parties need not satisfy their summary judgment burden.  *See, e.g.*, *Urbont v. Sony Music Entm't*, 100 F. Supp. 3d 342, 353 (S.D.N.Y. 2015) ("[A] settlement does not mean that the claim had merit or that it would have withstood scrutiny." (quoting *Taylor v. First Med. Mgmt.*, 508 Fed. Appx. 488, 497 (6th Cir. 2012)), *aff'd in part, vacated in part on other grounds*, 831 F.3d 80 (2d Cir. 2016).  Because the Court dismisses Knox, DJW, and Pangea, the Court grants the remaining parties' request to reinstate the settlement agreement.

## IV. CONCLUSION

For the reasons stated above, the Knox and Pangea motions are DENIED, and the K&K motion is GRANTED.  By **March 27, 2017**, the remaining parties shall submit a joint proposed final judgment specifying the manner in which the funds should be disbursed, including the amounts and the respective payees' names and addresses.

The Clerk of Court is directed to terminate the motions at ECF Nos. 138, 143, 145, and 153.

SO ORDERED.

Dated:  March 20, 2017
     New York, New York

 

KIMBA W. WOOD
United States District Judge